**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 19-cr-55-CJW |
| vs. | **REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS** |
| MICHELLE RAE SIMMERMAKER, | |
| Defendant. | |

_____

## I.    INTRODUCTION

The matter before me is Defendant's Motion to Suppress.  (Doc.  28.)  On May 23, 2019, a federal grand jury indicted Defendant with Possession with Intent to Distribute a Controlled Substance (i.e., 5 grams or more of actual (pure) methamphetamine).  (Doc. 2.)

The Honorable Charles J. Williams, United States District Court Judge, referred this motion to me for a Report and Recommendation.  On September 12, 2019, I held an evidentiary hearing on Defendant's motion.  At the hearing, the Government called the following witnesses:

- Cedar County Deputy Sheriff Bode Koranda,
- City of Tipton Police Sergeant Bradley Peck, and
- Cedar County Deputy Sheriff and Muscatine Country Drug Task Force Member Matt Jackson.

Government's Exhibits 1-7 were admitted into evidence, as were Defendant's Exhibits A and B.  Following the hearing, each party submitted a supplemental brief at my request. (Docs. 41, 42.)  Defendant seeks to suppress evidence resulting from the search of a Brinks Home Security container ("the Brinks box") depicted in Government's Exhibit 6, pages 4 through 11.  She alleges the search was made without a warrant in violation of

1

the Fourth Amendment.  She also seeks to suppress statements she made during what she contends was a custodial interview by law enforcement officers without her having received warnings required by *Miranda v. Arizona,* 384 U.S. 436 (1966).

For the following reasons, I respectfully recommend that the Court **grant in part and deny in part** Defendant's Motion to Suppress.  (Doc. 28.)

## II.    FINDINGS OF FACT

On November 15, 2018 members of the Cedar County Drug Task Force executed a search warrant at a single-family residence on Meridian Street in Tipton, Iowa.  The residence was the home of WS.  The warrant had been signed two days previously by an Iowa state court judge.  (Gov. Ex. 1.)  Tipton Police Sergeant Bradley Peck executed the affidavit in support of the warrant.  (*Id.*)  Much of the factual basis for the warrant was obtained from informant CS.  CS told Sergeant Peck and Cedar County Deputy Sheriff Matt Jackson that JT was a low-level methamphetamine distributor in Tipton who was supplied by MW.  CS told the investigators that JT was living with WS, a woman.  WS had a criminal history including possession of controlled substances.  Moreover, CS told officers he had been living with WS while also selling narcotics in Tipton.  Sergeant Peck's affidavit states, "The residence that [JT] was living in with [WS] has a history of drug use, and people coming and going from the residence are known drug users." *(Id.* at 5.)

The warrant authorized search of the residence as well as the person of WS.  The warrant authorized the search and seizure of a variety of items relating to drug trafficking including controlled substances, paraphernalia packaging, items used for consumption of controlled substances, items used to manufacture or deliver controlled substances, photographs or data having information associated with drug trafficking, weapons, currency, and other items.  Significantly, the warrant authorized search and seizure of "[l]ocked containers, safes, hidden compartments or other items or areas capable of storing or concealing any of the other items listed herein."  (*Id.* at 10.)

2

A second application for a search warrant was sought and obtained after execution of the first warrant. The second application is identical to the first application except that it also seeks permission to search Defendant and provides the additional information:

12. During the execution of a search warrant at the residence, MICHELLE SIMMERMAKER was located in the living room area sleeping on the couch. MICHELLE SIMMERMAKER advised she has been staying at the residence for approximately 1 week.
13. MICHELLE SIMMERMAKER has prior convictions for possession of methamphetamine in 2017.
14. Found on the couch with MICHELLE SIMMERMAKER was a glass pipe used for smoking methamphetamine.
15. Found on the couch with MICHELLE SIMMERMAKER was a box containing plastic baggies with a crystal substance that appears consistent with methamphetamine.

(Gov. Ex. 2 at 6.) The search of the Brinks box occurred before law enforcement obtained the second warrant. There is no allegation that Defendant consented to the search or that exigent circumstances somehow excused the warrant requirement. Thus, the crucial issue with respect to the search of the Brinks box is whether the first warrant authorized its search.

The events at the residence are relevant to the claim of an unlawful search and the alleged *Miranda* violation. A description of the events during the search is made more complicated by the number of law enforcement officers and the persons present at the residence during the search. Parts of the search were captured and preserved on video from the body cameras of some of the officers. The Government represents, after conferring with Defendant's counsel that the body cameras record the following start times:

1) Government's Exhibit 3 (Koranda) at 10:01 a.m. on November 15, 2018;
2) Government's Exhibit 4 (Koranda) at 9:41 a.m. on November 15, 2018;
3) Government's Exhibit 5 (Koranda) at 10:13 a.m. on November 15, 2018;

4) Government's Exhibit 7 (Sorgenfrey) at 9:29 a.m. on November 15, 2018.

(Doc. 41 at 3.) Deputy Koranda was wearing a body camera that captured, among other things, the outside of the residence during the search while he was providing security. During the approximately 10 to 15 minutes he stood outside, the children who were present when law enforcement arrived to execute the search exited the residence and left with a man in a pickup truck. (Koranda Hr'g Test.) Also during this time, Deputy Koranda arranged to have a woman employed by the Sheriff's office come to the residence to pat down Defendant to allow Defendant to use the restroom while the search was being completed.

Deputy Koranda briefly went inside and then came back out. He turned his body camera on again and recorded a conversation involving Defendant, Deputy Jackson, and Sergeant Peck. Deputy Koranda also transported Defendant to jail. At no time did Deputy Koranda administer a *Miranda* warning. Deputy Koranda testified that he did not attempt to interview Defendant because he was not part of the search team.

Sergeant Peck had been conducting an investigation of WS in November 2018, which resulted in the warrant to search her person and residence as shown in Exhibit 1. At the residence at the time of the search were TH, WS, DW, and Defendant, as well as two young children.[1] Defendant was sleeping on a couch in the living room on the main floor. Defendant was alone in the room when she was located. (Jackson Hr'g Test.) Investigators later learned from WS that Defendant had been staying at the residence for two nights. Prior to entering the residence, law enforcement did not know Defendant would be present.

---

[1] In addition to Deputy Koranda's body camera video, parts of the search were recorded by Deputy Sorgenfrey. Deputy Sorgenfrey's camera captured the entry into the residence, but he proceeded upstairs and encountered TH. This encounter is not pertinent to the Court's analysis. To the extent his body camera captured relevant footage regarding Defendant, it will be discussed below.

4

Sergeant Peck testified he believed Officer Frey[2], another member of the Muscatine County Drug Task Force, found the Brinks box on top of the couch where Defendant was sleeping. Officer Frey was not called to testify, no recording from his body camera (if any exists) was offered, and no witness testified about observing this search (if there was such a witness).

The Brinks box is made of steel, is secured with a key lock and is a rectangular shape approximately eight inches by four inches by four inches. Officer Frey also found the pipe used to smoke methamphetamine near where Defendant was sleeping, as detailed in Government's Exhibit 2. After Defendant was awakened, she was summoned from the couch in the living room and placed in the dining room area with other adult occupants of the residence by Deputy Jackson. Defendant was handcuffed, placed in a chair, and told she should not get up. (Peck Hr'g Test.) Sergeant Peck testified it was necessary for the occupants of the residence to remain in place for officer safety. (*Id.*) Defendant was never told she was free to leave.

One of the members of the search team took photographs depicting the condition of the rooms prior to commencing the search. (Jackson Hr'g Test.) It is unclear who took the pictures. Government Exhibit 6, page 2 depicts the living room in its condition after Defendant was summoned to the dining room by Deputy Jackson. This photograph shows the Brinks box on the couch where Defendant was initially found. (*Id.*)

When opened, the Brinks box proved to hold four baggies containing approximately 14 grams of methamphetamine, some smaller baggies, a scale, and some other drug paraphernalia. (Peck Hr'g Test.) Defendant's phone was also found in or near the box. (*Id.*)

I find that, contrary to Defendant's allegation, the officers did not force open the Brinks box but used a key. It is unclear how Officer Frey located and identified the key

---

[2] Sergeant Peck could not recall Officer Frey's first name. Deputy Matt Jackson later identified him as Andy Frey.

to the Brinks box. It took law enforcement less than half an hour to amend the prior warrant application to include the additional information and return with a signed warrant. During this approximately half-hour interval, Defendant remained in the residence.

None of the witnesses testified that Defendant was asked whether the box belonged to her. Nor did they identify any statements from her claiming ownership. Sergeant Peck, who was in charge of the investigation, did not know what Defendant may have said about the box at the time it was found. (*Id.*) Defendant did not testify at the hearing. However, the nature of the arguments submitted on her behalf suggests she may remember the events and discussion with the officers differently. These arguments are not evidence. The body camera videos disclose some comments she made, but none are particularly relevant or incriminating. The warrant application mentions her statement that she had been staying at the residence for a week. (Gov. Ex. 2 at 6.)

Sergeant Peck testified that although Defendant was placed in handcuffs when law enforcement first entered the residence, she was not placed under arrest. Her handcuffs were later removed after she was patted down so she could use the restroom unattended. In addition, Defendant was permitted to go outside to smoke a cigarette without handcuffs but under the supervision of law enforcement officers. Sergeant Peck testified that while Defendant was outside smoking, he walked out and simply asked if she wanted to talk to the officers. He testified that Defendant declined to be interviewed. He testified that she was not *Mirandized*, she stayed on the porch smoking, and the conversation did not continue.[3] At this point, Defendant was not wearing handcuffs, but she was not free to leave. (Peck Hr'g Test.)

It is at this juncture that Defendant made statements that may be relevant to the case. Sergeant Peck testified that Defendant criticized law enforcement in relation to its investigation and prosecution of her husband. More relevantly, she also stated several

---

[3] I note that Defendant and the officers were not completely silent during this time. At one point an officer asked if she had a phone and asked if it had a passcode.

times that all the "meth" in the house belonged to her. Sergeant Peck testified these comments were not made in response to any inquiry from law enforcement. Sergeant Peck, who was in charge of the investigation, is not aware of any statements made by Defendant while she was handcuffed and detained in the dining room. In fact, he had made inquiry of the officers involved in the search, including Officer Frey, and he was not aware of any other statements Defendant made about the contents of the Brinks box, its ownership, or other incriminating statements.

Deputy Jackson entered as part of the search team and made first contact with Defendant at the threshold of the living room. His approach to the living room can be seen briefly in the body camera video recorded by Officer Sorgenfrey. (Gov. Ex. 7 at 1:34.) Officer Sorgenfrey's body camera does not appear to show Officer Frey entering the residence. Deputy Jackson recognized Defendant and called her out of the living room, handcuffed her with her hands in front of her body, and had her sit on a chair in the dining room. After approximately 30 minutes, Defendant was patted down and permitted to use the restroom without being handcuffed. At this point Deputy Jackson did not consider her under arrest; however, she was not free to leave. (Jackson Hr'g Test.) Deputy Jackson also made inquiry of all the members of the search team who were present and none could recall asking Defendant if the Brinks box belonged to her.

Deputy Jackson was present on the porch while Defendant was smoking. He confirmed that Defendant declined to be interviewed and was not provided *Miranda* warnings. He testified Defendant continued to talk, but not in response to questions from officers. Detective Jackson recalls Defendant was upset with the prior investigation involving her husband. Defendant also seemed to want to clarify that other occupants of the house should not "get in trouble" and made statements to the effect that all the methamphetamine belonged to her.

## III.   DISCUSSION

### A.   The Parties' Positions

Defendant contends her statements made during a custodial interrogation and without the benefit of a *Miranda* warning are inadmissible.  The Government first denies there was any custodial interrogation.   The Government continues "[t]o the extent defendant's statements regarding the possession of the Brinks container were in response to police inquiries" . . . "defendant here was not in custody."  (Doc. 31-1 at 9.) However, at the hearing, the Government presented no evidence of Defendant's statements made while she was detained in the house or any statements about the Brinks box.  The only apparently relevant statements by the Defendant referenced at the hearing were not about the Brinks box, but about her more general assertion that all of the "meth" was hers.

Defendant argues she has standing to challenge the search of the Brinks box because she told the police she owned it, she took precautions to maintain its privacy by locking it, the box itself gives the impression that the contents are private, and it was located near her.  (Doc. 28-1 at 4.)  Thus, she had a legitimate expectation of privacy with respect to the box.  (*Id*.)  She also contends that the search of the Brinks box was not authorized by a warrant and thus violated her legitimate expectation of privacy with respect to the box and its contents.  Next, she asserts the initial search warrant did not authorize a search of the Brinks box.  She notes that WS was the only person listed in the warrant application.  She asserts that although the warrant authorized the search of locked containers in the residence, it did not authorize searches of unnamed persons or their personal property.  Defendant argues the warrant was not sufficiently particularized with respect to her.  She further argues that law enforcement did not have authority under the warrant to search her or her belongings because she was a visitor.  In support of these arguments she states:

> Police knew that the Brinks Home Security container belonged to the defendant.  Police knew that the warrant they possessed only authorized the

8

search of the person of [WS] and the locked containers that had a connection to [WS] or the residence. The police knew that the defendant was not [WS]. The police did not have authority to search the personal belongings of any and all persons located in the residence at the time of the search. As such, the contents of the Brinks Home Security container, and any resulting evidence that came from the container (such as the dumping of the contents of defendant's cell phone onto police memory drive) is inadmissible at defendant's trial.

(Doc 28-1 at 7.)

The Government does not contest Defendant's standing to assert her interest in the Brinks box. However, the Government argues that a search warrant need not identify the particular defendant against whom the evidence may be used. (Doc. 31-1 at 5) (citing *United States v. Coleman*, 909 F.3d 925, 931 (8th Cir. 2018)). Principally supported by *United States v. Cowan*, 674 F.3d 947 (8th Cir. 2012), the Government asserts the circumstances could lead a reasonable officer to infer there was a "common enterprise" involving Defendant and the other occupants of the house that entitled them to search pursuant to the warrant "locked containers, safes, hidden compartments or other items or areas capable of storing or concealing any other items," including the Brinks box. (*Id.* at 5-7.)

**B.     Whether Defendant's statements must be suppressed because they were made without the benefit of Miranda warnings.**

*Miranda v. Arizona* requires law enforcement to provide certain warnings before interrogating a suspect who is in custody. *United States v. New*, 491 F.3d 369, 373 (8th Cir. 2007) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). "[W]arnings are required when interrogation is 'initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *Id.* (quoting *Miranda*, 384 U.S. at 444.) To determine if a person is in custody,

> [t]wo discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave. Once the scene is set and the

9

players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.

*J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011) (quoting *Thompson v. Keohane*, 516 U.S. 261, 270 (1995)).

"Custody occurs either upon formal arrest or under *any other circumstances* where the suspect is deprived of his freedom of action in *any* significant way." *United States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir. 1990) (emphasis in original) (citing *Miranda*, 384 U.S. at 444; *Berkemer v. McCarty*, 468 U.S. 420, 429 (1984)). In determining whether Defendant was in custody, the Court must decide whether a reasonable person in Defendant's position "would have understood his situation to be one of custody." *Id.* (quotations omitted). Courts consider the totality of the circumstances when deciding if individuals are in custody. *See United States v. Elzahabi*, 557 F.3d 879, 883 (8th Cir. 2009) (citing *States v. Brave Heart*, 397 F.3d 1035, 1038-39 (8th Cir. 2005)).

*Griffin* provides six factors for the Court to assess when determining whether a person was in custody.

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*Id.* at 1349. The factors are not exhaustive. *Id.* However, "the presence or absence of these particular indicia of custody" can be influential in the Court's assessment of the "totality of the circumstances surrounding an official interrogation." *Id.*

### 1. Defendant's Statements Inside the Residence

There is an odd disconnect between the statements Defendant seeks to suppress and the statements law enforcement claims she made as shown by the evidence at the hearing. Defendant argues:

> The defendant was questioned while handcuffed and sitting in the chair in the dining room. The defendant admitted that [sic] knew of the contents of the container and the contents belonged to her. She was then questioned regarding the source of the methamphetamine. She stated that she was not interested in providing that information to officers.

(Doc. 28-1 at 3.) Perhaps this argument reflects Defendant's differing recollection of the events. Nevertheless, the evidence adduced does not support the existence of any statements by Defendant while she was handcuffed in the dining room, including any admissions regarding her knowledge of the contents of the box or her ownership of it. On the contrary, Sergeant Peck and Deputy Jackson testified that they had made inquiries regarding any such statements of the other members of the search team and discovered none. The Government admits as much:

> The government notes that defendant sought the suppression of a statement she claimed was made in response to an inquiry regarding the ownership of the Brinks box. Evidence at the hearing showed no such inquiry had been made and, therefore, there is no such response to suppress.

(Doc. 41 at 6 n.2.)

I will not undertake the essentially theoretical task of determining whether Defendant was subjected to custodial interrogation at some point when she was in the dining room, perhaps making statements that the Government denies exist. Among other reasons, *Thompson v. Keohane*, adjures courts to consider the circumstances surrounding the interrogation. 516 U.S. 99, 112 (1995). The evidence shows the circumstances while Defendant was in the dining room were in flux. At times she was in handcuffs and other times she was not. Occupants of the residence and law enforcement officers came and went from this centralized location. If law enforcement officers are not attributing to

11

Defendant statements made at a particular time in this varied sequence, it is well-nigh impossible to apply the factors required by *Griffin*, 922 F.2d 1343.

For example, if the officers do not contend a defendant was questioned or had even made a statement, it would be speculative to determine whether the defendant was restrained during the theoretical "questioning." Similarly, whether the suspect initiated contact or voluntarily acquiesced to requests to respond to "questions" is speculation if there is no specificity regarding what Defendant may have initiated or responded to. Determining whether police used strong arm tactics or deceptive stratagems during "questioning," would be speculative, at best, without evidence of relevant questions, the responses, and the surrounding circumstances at the time of the questioning.

While I will not grant a motion to suppress evidence whose existence is speculative, I will recommend that the District Court enforce what amounts to the Government's stipulation that Defendant made no statements while she was detained in the dining room. The Government's footnote on page 6 of its post-hearing brief states there are no such statements. The Government was on notice that Defendant sought to have any such statements suppressed and, in fact, law enforcement made inquiry about the possible existence of such statements. Moreover, the Government has a duty under *Brady v. Maryland*, 373 U.S. 83 (1963) to produce such statements to Defendant, but did not do so – apparently because they do not exist.

The Government did not call Officer Frey to testify. Defendant contends she was asked about the Brinks box. Officer Frey could have been in a position to have heard such statements. However, he was asked the day before the hearing and denied knowledge of such statements. (Peck Hr'g Test.) The Government should not be permitted to offer contradictory evidence at trial (e.g., testimony from Officer Frey or others regarding other admissions from the Defendant inside the residence).

### 2. *Defendant's Statements on the Porch*

The statements attributed to Defendant on the porch must be analyzed separately. The Government contends Defendant voluntarily announced on the porch that all the

12

methamphetamine in the house was hers. *Miranda* warnings are only necessary when defendants are questioned in custodial situations. *United States v. Layne*, 973 F.2d 1417, 1421 (8th Cir. 1992) ("A *Miranda* warning requirement is not applicable to every situation where law enforcement asks questions, rather it is the compulsive or coercive aspect of custodial situations that trigger *Miranda*.").

### a. Whether Defendant was Informed at the Time that the Questioning was Voluntary and that she was Free to Leave

This *Griffin* factor requires a determination of "whether police told the suspect that the questioning was voluntary, the suspect could leave or ask the officers to do so, or that the suspect was not considered under arrest." 922 F.2d at 1349. "The most obvious and effective means of demonstrating that a suspect has not been taken into custody . . . is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." *United States v. Williams*, 760 F.3d 811, 814 (8th Cir. 2014) (ellipses in original). The Eighth Circuit has "never held that a person was in custody after receiving [these admonitions.]" *Id.* (citing *United States v. Perrin*, 659 F.3d 718, 721 (8th Cir. 2011)) (noting internal citation omitted).

Application of the first *Griffin* factor, yields a mixed result. Defendant was apparently asked if she wanted to give a voluntary statement and declined. There were, however, questions posed to the Defendant on the porch after she declined regarding her cell phone and cell phone password. In other words, it is not as though law enforcement asked no questions and elicited no responses. In addition, Defendant was not free to leave during the time she was on the porch. Sergeant Peck testified that Defendant was not placed under arrest before the second warrant was obtained. (Peck Hr'g Test.) Deputy Jackson testified she was not under arrest at the time she was allowed to use the restroom. However, both officers testified that Defendant was not free to leave the residence and Deputy Jackson testified that Defendant was never told she could leave. It is also unclear if Defendant was considered under arrest during the interaction on the porch. It is significant that the interaction on the porch ends with Deputy Jackson stating,

13

"Why don't we start walking over to the car?" Deputy Koranda then walked her to his car and handcuffed her. While these last acts are consistent with an arrest, it remains unclear if the officers had determined Defendant was under arrest or advised her of that fact previously. This factor weighs in favor of a conclusion she was in custody on the porch.

### b. Whether Defendant Possessed Unrestrained Freedom of Movement During Questioning

The second factor supports a finding Defendant was in custody. While she was no longer handcuffed, she was constrained to a small area of the front porch which, again, she was not free to leave.

### c. Whether Defendant Initiated Contact with Authorities or Voluntarily Acquiesced to Official Requests to Respond to Questions

Application of this factor also produces a mixed result. Defendant appears to have declined the general invitation to give a statement. Government's Exhibit 5 is Deputy Koranda's body camera footage of Defendant smoking on the porch in the presence of Sergeant Peck, Deputy Jackson, and Deputy Koranda. The first 19 seconds are silent, but Defendant's behavior is consistent with Deputy Koranda's testimony that she was upset about something he thought might be significant so he turned on his recording. It seems more likely that his camera captured Defendant's angry statements about her husband's prosecution than her claims about the methamphetamine in the house. Sergeant Peck testified Defendant's comments about the methamphetamine were made while evidence was being removed. No evidence appears to have been removed from the house during the interval captured on Exhibit 5.

There was a short period of silence while Defendant smoked, broken by Deputy Jackson's question about her cell phone. (Gov. Ex. 5 at 1:12.) In response to this question, Defendant said her cell phone was in the area where she had laying on the couch. She did not appear to provide the phone's passcode.

Defendant's statements that all the methamphetamine in the house belonged to her are not recorded. However, Deputy Jackson testified there were at least two such statements and they were not in response to officers' questions. (Jackson Hr'g Test.) Deputy Jackson's testimony that she made the comments that all the methamphetamine belonged to her so that others would not get in trouble is consistent with them being voluntary. (*Id.*) These comments will be discussed further, below. I find that this factor weighs in favor of finding Defendant was not in custody on the porch.

### d. Whether Strong Arm Tactics or Deceptive Stratagems were Employed During Questioning

I recommend the Court find there were not strong arm tactics or deceptive stratagems used. I see no evidence of such behavior on the porch or at any time during the search. The evidence inside the residence shows law enforcement to be casual and respectful with the occupants present, as the circumstances allowed. I see nothing in the testimony or the video evidence that would lead me to believe such behavior occurred on the porch. This factor weighs against a finding that Defendant was in custody on the porch.

### e. Whether the Atmosphere of the Questioning was Police Dominated

Interviews conducted in familiar surroundings are less likely to be viewed as custodial interrogations by the reasonable person. *See United States v. Rorex*, 737 F.2d 753, 756–57 (8th Cir. 1984); *United States v. Rosenblum*, No. CRIM 07-294 JRTFLN, 2008 WL 608297, at *6 (D. Minn. Jan. 16, 2008). Although Defendant was familiar with her surroundings, Defendant was alone and surrounded by three officers during this interaction. In addition, Defendant did not have her cell phone with her, which deprived her of contact with anyone other than the officers on the porch. *Contra United States v. Rosetter*, No. CR. 10-83 JNE JSM, 2010 WL 5184991, at *26 (D. Minn. Oct. 1, 2010) (factor weighed in favor of non-custodial interrogation when defendant had cell phone during interview) (citing *United States v. LeBrun*, 363 F.3d 715, 722 (8th Cir. 2004) (finding that a phone provides "a line of communication between [defendant] and the

15

outside world and to some extent mitigated the incommunicado nature of interrogations with which the *Miranda* court was concerned and the psychological pressure associated with being isolated in an interview room.") (brackets in original)), *R. & R. adopted*, 2010 WL 5173155 (D. Minn. Dec. 13, 2010). Thus, the situation was police-dominated. This factor weighs in favor of finding that Defendant was in custody on the porch.

> ### f.     Whether the Suspect was Placed Under Arrest at the Termination of the Questioning

As addressed above, although it is not clear when exactly Defendant was arrested, she left the porch in the custody of Deputy Koranda and was taken to jail and booked. Therefore, it appears she was arrested, at the latest, after the interaction on the porch. Therefore, this factor seems to weigh in favor of finding that Defendant was in custody on the porch.

> ### g.     Conclusion

Weighing the totality of the circumstances, I find that an analysis of the *Griffin* factors weigh in favor of finding that Defendant was in custody when she was on the porch. As *United States v. Martinez* notes, the critical inquiry is not about the coercive or police-dominated environment, but whether Defendant's freedom to depart was restricted in any way. 462 F.3d 903, 909 (8th Cir. 2006) (citation omitted). Here, Defendant was confined to a small porch alone with three officers, was deprived of access to her cell phone, was never told she could leave, and was arrested immediately after speaking to the officers. Under these circumstances, a reasonable person in Defendant's position "would have understood [her] situation to be one of custody." *Griffin*, 922 F.2d at 1347. I conclude Defendant's freedom to depart was restricted and recommend the District Court find she was in custody when she was on the porch.

> ### h.     Whether Statements Were Voluntary and Should be Suppressed

That I found that Defendant was in custody when she was on the porch does not necessarily end the inquiry. The Government argues that Defendant's incriminating

statements were voluntary and not compelled, and therefore need not be suppressed. The Government relies upon *United States v. Bailey*, 831 F.3d 1035, 1038 (8th Cir. 2016). In *Bailey*, the defendant was left in a squad car with a recording device running while a police officer searched for a gun the defendant was suspected of possessing. *Id.* at 1037. Defendant was recorded saying, "Damn, they found that gun. F***. Damn. F***. Oh, man. Damn." *Id.* Relying on *United States v. McGlothen*, 556 F.3d 698, 701 (8th Cir. 2009), *Bailey* noted, "Voluntary statements unprompted by interrogation are admissible with or without *Miranda* warnings." *Id.* at 1038. *Bailey* further noted that "[i]nterrogation occurs only when there is express police questioning or its 'functional equivalent,' which means 'words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *Id.* (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980) (noting emphasis added; footnote omitted)) (ellipses in original).

> That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily on the perceptions of the suspect, rather than on the intent of the police . . . . But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

*Innis*, 446 U.S. at 301-02 (emphasis in original). Here, the evidence shows that Defendant's statements that "all the meth in the house" was hers were elicited by law enforcement carrying evidence out of the residence. This is similar to *Young v. Sirmons*, where the officers were dealing with evidence in the presence of a defendant who volunteered statements. No. 00-CV-00310-JHPPJC, 2007 WL 2248158 (N.D. Okla. Aug. 2, 2007), *aff'd*, 551 F.3d 942 (10th Cir. 2008).

17

In *Young*, the petitioner claimed that "his rights guaranteed by the Fifth Amendment were violated by the introduction at trial of statements he made after his arrest regarding blood on a pair of shoes seized by police." *Id*. at *25. The petitioner had been arrested and *Mirandized*. *Id*. at *26. While officers were looking at and discussing the shoes in the petitioner's presence, the petitioner stated he had been cleaning fish and the shoes might have fish blood on them. *Id*. at *27. *Young* concluded

> This Court finds nothing in the record to indicate that Officers Griggs and Campbell should have known their observation of, and conversation about, the shoes would elicit Petitioner's voluntary statement about fish blood. The record does not suggest that the actions of the officers constituted the kind of psychological ploy that could be treated as the functional equivalent of interrogation.

*Id*. at *29. I recommend the Court reach the same conclusion in the case at bar. Even though Defendant was in custody, had not been afforded *Miranda* warnings, and was subject to some further questioning (i.e., regarding her cell phone) there is no evidence that law enforcement, in merely removing evidence from the scene in Defendant's presence, had undertaken the functional equivalent of interrogation.

Thus, I recommend the District Court find Defendant was in custody while she was on the porch, but that her statements, under these circumstances, were voluntary admissions and not the product of interrogation and need not be suppressed. Accordingly, I recommend that the District Court deny this part of Defendant's motion.

## C.   *The Search of the Brinks Box*

"The Fourth Amendment protects against unreasonable searches and seizures, but its protections are personal and cannot be asserted by persons lacking a legitimate expectation of privacy in the place searched." *United States v. Kuenstler,* 325 F.3d 1015, 1020 (8th Cir. 2003) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)) (quotations omitted). *Ybarra v. Illinois* held:

> Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the

18

> fact that coincidentally there exists probable cause to search or seize another
> or to search the premises where the person may happen to be. The Fourth
> and Fourteenth Amendments protect the "legitimate expectations of
> privacy" of persons, not places.

444 U.S. 85, 91(1979) (citations omitted). In *Ybarra*, the police obtained a warrant to search a tavern and its bartender because of suspected heroin trafficking. *Id.* Seven or eight police officers entered the tavern and proceeded to pat down the customers for weapons, ultimately locating heroin on the defendant's person. *Id.* at 88-89. *Ybarra* held that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Id.* at 91.

Courts have routinely recognized that purses, backpacks, and similar accoutrements are so closely associated with one's person that a search of them must be supported by a warrant satisfying the particularity requirement, or by one of the exceptions to the warrant requirement. *See United States v. Salinas-Cano*, 959 F.2d 861, 866 (10th Cir. 1992) (warrantless search of suitcase not justified based on "the basis of the presence of a suitcase in the home of another" and inference of authority to search "merely from [the consenter's] ownership of the house"); *United States v. Robertson*, 833 F.2d 777, 784-85 (9th Cir. 1987) (warrant to search residence, curtilage, and appurtenances did not justify search of backpack within possession of defendant visiting premises); *United States v. Graham*, 638 F.2d 1111, 1114 (7th Cir. 1981) (purses or shoulder bags "are appended to the body" and thus "included within the concept of one's person"); *United States v. Sporleder*, 635 F.2d 809, 813-14 (10th Cir. 1980) (search of defendant's pockets not justified by search warrant authorizing search of "premises"); *United States v. Branch*, 545 F.2d 177, 182 (D.C. Cir. 1976) (search of shoulder bag not authorized by search warrant for apartment).

"To invoke the protection of the Fourth Amendment, one must establish a legitimate expectation of privacy in the invaded place." *United States v. Hill*, 393 F.3d

839, 841 (8th Cir. 2005) (citing *Rakas*, 439 U.S. at 143). "To establish a legitimate expectation of privacy, the [defendant] must demonstrate: (1) a subjective expectation of privacy; and (2) that this expectation is one that society is prepared to recognize as objectively reasonable." *United States v. Green*, 275 F.3d 694, 699 (8th Cir. 2001) (citation omitted).

Defendant therefore must establish that she had a legitimate expectation of privacy in the Brinks box. "Although a person generally has an expectation of privacy in items he places in a closed container, some containers so betray their contents as to abrogate any such expectation." *United States v. Meada*, 408 F.3d 14, 23 (1st Cir. 2005) (citations omitted).

> Not all containers and packages found by police during the course of a search will deserve the full protection of the Fourth Amendment. Thus, some containers (for example a kit of burglar tools or a gun case) by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance.

*United States v. Banks*, No. 4:05-CR-00049-JEG, 2005 WL 6064914, at *6 (S.D. Iowa Sept. 15, 2005) (quoting *Arkansas v. Sanders*, 442 U.S. 753, 764 n.13 (1979)), *aff'd*, 514 F.3d 769 (8th Cir. 2008).

In the instant case, it is not difficult to find Defendant's expectation of privacy in the Brinks box was reasonable. Brinks is a well-known private security company famous for carrying money and valuables in its armored trucks. The box in question has a lock and was locked when Officer Frey encountered it. Moreover, it is emblazoned with the words "BRINKS HOME SECURITY." *United States v. Chadwick* held,

> By placing personal effects inside a double-locked footlocker, respondents manifested an expectation that the contents would remain free from public examination. No less than one who locks the doors of his home against intruders, one who safeguards his personal possessions in this manner is due the protection of the Fourth Amendment Warrant Clause.

433 U.S. 1, 11 (1977), *abrogated on other grounds by California v. Acevedo*, 500 U.S. 565 (1991).

The issue facing the Court is whether the police acted within the scope of the warrant by searching the Brinks box. As the parties' arguments make clear, the issue is not merely whether the Brinks box was the type of item authorized to be searched and whether it was located at the Meridian Street address. Clearly, it is a "locked container" and it was found in the residence as specified in the warrant. The critical analysis relates to the relationship of the Brinks box to the residence and the people there.

After *Ybarra*, courts have addressed the difficulties presented by the presence of visitors and their belongings, often unanticipated, at the time of a search. The Eighth Circuit has held

> [w]hile possession of a warrant generally justifies searching the effects of those occupying the premises, *see United States v. Lucas*, 932 F.2d 1210 (8th Cir. [1991]), *special Fourth Amendment concerns arise when the persons on the premises are visitors. See Ybarra*, 444 U.S. at 91–92, (visitors are clothed with Fourth and Fourteenth Amendment protections; requirement for individualized probable cause to search a citizen not defeated by citizen's mere presence on premises for which a search warrant has issued).

*Hummel-Jones v. Strope*, 25 F.3d 647, 651 (8th Cir. 1994) (emphasis added; internal citations modified).

In *Maryland v. Pringle*, the defendant was one of three passengers stopped for speeding. The search of the vehicle turned up cocaine. The Court distinguished *Ybarra* on the basis that the vehicle's occupants

> were in a relatively small automobile, not a public tavern. In *Wyoming v. Houghton*, 526 U.S. 295 (1999), we noted that a "car passenger – unlike the unwitting tavern patron in *Ybarra* – will often be engaged in a common enterprise with the driver and have the same interest in concealing the fruits or the evidence of their wrongdoing." *Id.*, at 304-305. Here we think it is reasonable for the officer to infer a common enterprise among the three men. The quantity of drugs and cash in the car indicated the likelihood of drug dealing, an enterprise to which a dealer would be unlikely to admit an innocent person with the potential to furnish evidence against him.

540 U.S. 366, 373 (2003) (internal citations modified). Relying on *Pringle*, the Sixth Circuit extended this principle to individuals in the "relatively small and confined space of [a] hotel room," holding,

> [I]t was reasonable for the officers to infer from the facts known to them at the time of the arrest that Santiago was involved in a common illegal-drug enterprise with Romero. The officers had "reasonably trustworthy information"—in the form of Romero's own statements to the undercover officers that he would sell them methamphetamine in that hotel room—that led the arresting officers to believe that the hotel room had been reserved and was being utilized for the purpose of drug dealing. It was reasonable for the officers to infer that Santiago was involved in the drug-dealing enterprise that was being conducted out of the hotel room, because drug dealing is "an enterprise to which a dealer would be unlikely to admit an innocent person with the potential to furnish evidence against him."

*United States v. Romero*, 452 F.3d 610, 618 (6th Cir. 2006) (quoting *Pringle*, 540 U.S. at 373)) (internal citations omitted).

The Eighth Circuit has recognized that a person's mere presence on the premises is not sufficient to justify a search during the course of executing a search warrant. *United States v. Clay*, 640 F.2d 157, 162 (8th Cir. 1981). In *Clay*, the defendant approached a house during the execution of a warrant and knocked on the door. *Id.* at 158. The officer who answered the door immediately ordered him inside at gunpoint and conducted a pat search that disclosed marijuana and a gun. *Id.* The court held,

> To justify a search of this type, the officer must have knowledge that the visitor previously had been engaged in serious criminal conduct, *or that suspicion exists sufficient to draw a reasoned conclusion that the visitor is involved in the criminal activity* that constituted the basis of the issuance of the search warrant or that other exigent circumstances exist that justify a determination that the person with whom the officer is dealing may be armed or presently dangerous.

*Id.* at 161–62 (8th Cir. 1981) (emphasis added; internal citations omitted).

In the instant case, both parties rely on two cases where unanticipated visitors were encountered and searched by law enforcement incident to residential apartment searches:

22

*Cowan*, 674 F.3d 947 and *United States v. Giwa*, 831 F.2d 538 (5th Cir. 1987).  For the purposes of my analysis, it is important to note what the particular law enforcement officers knew and when they knew it.

In *Cowan*, the police executed a search warrant on an apartment where they believed crack cocaine was being sold.  674 F.3d at 951.  The warrant authorized the search of "the apartment, the person of Booth, and associated parking areas for controlled substances and '[i]ndicia of occupancy, residency, rental and/or ownership of the premises, described herein including . . . keys.'"  *Id*. (ellipses in original).  As the seven-member search team entered, they saw a person running from one part of the apartment to another.  *Id*.  In the apartment there were at least eight adults, including Cowan, as well as two children.  *Id. Cowan* held:

> Cowan's presence in Booth's apartment, unlike the patron in the public tavern in *Ybarra* and more like the passenger in the private car in *Pringle* or the hotel room occupant in *Romero*, could lead a reasonable officer "to infer [Cowan was part of] a common enterprise" among the people in the apartment. . . . Detective Canas had additional reason to suspect Cowan was involved in the drug trafficking activity.  After breaking down the exterior door to the building and before entering the apartment, the officers saw someone running inside, which reasonably suggested people present in the apartment were trying to conceal evidence of drug trafficking activity.  When Cowan stated he was from Chicago—the reported source of the crack cocaine used in the suspected drug trafficking operation occurring in the apartment—Cowan gave Detective Canas particularized suspicion that Cowan himself was involved in the drug trafficking.  The present case is further distinguishable from *Ybarra* because Detective Canas frisked Cowan's outer clothing pursuant to *Terry*, and the search of *Ybarra* was not a valid *Terry* frisk. Detective Canas did not violate Cowan's Fourth Amendment right to be free from unreasonable searches and seizures by patting down Cowan's pockets and seizing the keys.

*Id*. at 955 (brackets in original).  Thus, *Cowan* relied on the facts known to the officer performing the frisk to find his inference of a common enterprise was reasonable.

In *Giwa*, Secret Service agents executed a warrant on the apartment of Aruya to search for evidence of credit card fraud. 831 F.2d at 539.  Armed with the warrant and

a description describing Aruya "as a black male with a foreign accent of Nigerian nationality," two agents knocked on the door. *Id.* The defendant, a black Nigerian man, opened the door clad in slacks and a bathrobe. *Id.* Believing the defendant to be Aruya, the agents frisked and handcuffed him. *Id.* The defendant denied he was Aruya. *Id.* When asked to produce identification, the defendant told the agents his identification was in a flight bag in a closet and pointed to it. The agents confirmed the bag belonged to the defendant but would not allow him to retrieve his identification for himself. *Id.* at 539-40. Upon opening the bag, the agents found the defendant's identification card, as well as multiple credit cards not in his name. *Id.* at 540. *Giwa* held:

> In the instant case, we agree with the district court's conclusion that mere physical possession should not be the sole criterion which should be used to determine whether a personal item may be searched pursuant to a premises search warrant. We believe that the better approach is that adopted in [*Micheli v. Micheli*, 487 F.2d 429 (1st Cir. 1973)] and [*United States v. Gray*, 814 F.2d 49, 51 (1st Cir. 1987)] which examines the relationship between the person and the place. Thus, we must examine Giwa's relationship to Aruya's apartment *as the agents perceived it when they executed the search warrant*. In answering this query, we do not agree with the district court's finding that Giwa was merely a "casual visitor" to the apartment. Giwa was an overnight visitor to Aruya's apartment. Additionally, at the time the agents arrived at the apartment, Giwa had been sleeping and answered the door clad only in a bathrobe and slacks, apparel indicating that his was more than just a temporary presence in the apartment. Finally, Giwa was discovered alone in a private residence. These facts support the conclusion that Giwa was not a "mere visitor" or "passerby" and thus, the agents could reasonably believe his flight bag contained evidence of credit card fraud. Therefore, the search of Giwa's bag by the agents in an effort to retrieve Giwa's identification was within the scope of the premises search warrant.

*Id.* at 544-45 (emphasis added).

The parties see the effect of these cases on the case at bar, especially *Giwa*, in very different lights. The Government argues, "Because defendant was more than a mere visitor, and was at a minimum an overnight guest, based on her discovery sleeping in the residence, officers could lawfully search the Brinks container even if it belonged to

defendant and even if defendant was not named in the warrant." (Doc. 41 at 3.) The Government continues, "In this case, defendant was found sleeping on the coach [sic], being the only person downstairs besides two minor children. In the video, she can be seen wearing clothes consistent with overnight stay and based on information provided be [sic] her and W.S., she was more than a casual visitor." (*Id.* at 5.)

> Defendant responds,
>
> In the instant case, the defendant was not the only adult female in [WS]'s residence—because [WS] herself was also present. Also, and very importantly, officers knew that the defendant was not [WS], because Deputy Jackson knew defendant since they were children. Thus, officers knew that the woman sleeping next to the Brinks container (the defendant) was not [WS]. There was no mistaken belief that the container actually belonged to [WS].

(Doc. 42 at 9.)

Defendant's and the Government's differing versions of the events each suffers, to some degree, from speculation. Each version also suffers from a misunderstanding of the nature of the exercise at hand. When applying for a search warrant, affiants are entitled to gather information from multiple sources and rely on information provided by others to establish probable cause. *See United States v. Edwards*, 891 F.3d 708, 711-12 (8th Cir. 2018) ("'[P]robable cause may be based on the collective knowledge of all law enforcement officers involved in an investigation . . . if there is some degree of communication.'") (quoting *United States v. Horne*, 4 F.3d 579, 585 (8th Cir. 1993)). As in *Cowan* and *Giwa*, the task at hand is different. Here, the Court must determine what the agents perceived when they executed the search warrant and whether the inferences they drew reasonably supported their decision to search the Brinks box.

Here, multiple agents perceived different, but sometimes overlapping, facts relevant to the overall search of the residence. As became clear at the hearing, however, only Officer Frey was present and ultimately made the decision to search the Brinks box. He did not testify and the Court was presented with very little evidence to determine what

facts were known to him and what inferences he may have reasonably drawn about the Brinks box.

Without speculation it is impossible to determine whether Officer Frey knew any of the following salient facts[4] before opening the Brinks box:

- that Defendant was present in the residence;

- that Defendant was not WS;

- that Defendant was located in the living room;

- that Defendant had been asleep in the living room;

- that Defendant had stayed at the residence for two nights;[5]

- that Defendant was the only person downstairs, other than two children; and

- that Defendant was wearing clothes consistent with an overnight stay.

In addition, the Court does not know whether Officer Frey had previously known or encountered Defendant, whether Officer Frey saw the methamphetamine pipe prior to his decision to open the Brinks box, or whether he had spoken to other officers or occupants of the residence and obtained information that may have informed his decision.

The evidence discloses only that Officer Frey, a member of the Muscatine County Drug Task Force, attended a safety briefing prior to execution of the warrant, searched the living room, found the Brinks box, and opened it shortly thereafter with a key he found in close proximity to the container. Officer Frey was unaware of the statements Defendant may have made about her ownership of the box or its contents. It appears, Officer Frey relayed information regarding the contents of the Brinks box quickly to

---

[4] I am not attempting to catalogue all possible facts that may have been relevant to understanding Defendant's relationship to the residence and the Brinks box. Rather, I focused on those facts the parties were concerned with in their analysis of *Giwa*.

[5] It appears WS was interviewed at the Cedar County Law Center on the same day as the search. If this is when law enforcement learned Defendant had stayed at the Meridian residence for two nights, then none of the law enforcement officers executing the search warrant would have been aware of this fact at the time the Brinks box was opened. The second warrant application states, apparently inaccurately, that Defendant had been staying there for approximately a week. (Gov. Ex. 2 at 6.)

26

Deputy Jackson and Sergeant Peck. There is no evidence that Deputy Jackson, Sergeant Peck, or other officers relayed information to Officer Frey pertinent to the decision to search the box before he opened it.

Without context, a Brinks box sitting on the couch of a residence during the execution of a search warrant presents an enigma. While *Cowan* permits officers to make reasonable inferences from facts known to them to determine whether the subject of a search is involved in "common illegal-drug enterprise," here the Government did not establish what facts were known to the officers, especially Officer Frey, or what inferences they actually made. Officer Frey may have known—perhaps he was even told—that Defendant was more than a casual visitor. Or he may have been unaware she was in the house. Officer Frey may have suspected—perhaps he was even told—the Brinks box was associated with Defendant. Or he may have assumed it belonged to WS or any of the other occupants of the residence.

Moreover, *Giwa* and *Cowan* involved searches of apartments, not of a two-story single-family residence, as in the case at bar. *Pringle* and *Romero* were distinguished from *Ybarra* based on the fact that the searches occurred in the relatively confined space of a motor vehicle and a hotel room, respectively. *Cowan* noted, "Although an apartment 'is a larger and more multipurpose space,' *Romero*, 452 F.3d at 618 n.2, than the hotel room in *Romero*, Detective Canas had additional reason to suspect Cowan was involved in the drug trafficking activity." 674 F.3d at 954. The justification to search the Brinks box in the instant case suffers both from the nature of the area to be searched and the absence of the officers' particularized justifications to search the box. A person's presence in a two-story, single family residence as opposed to a motor vehicle, hotel room, or even an apartment carries less of an implication of a common criminal enterprise.

For these reasons, I recommend the Court find that the search of the Brinks box was not within the scope of the search warrant and the results of that search and any evidence resulting from it should be suppressed.

## IV. CONCLUSION

For the foregoing reasons, I respectfully recommend Defendant's motion to suppress **(Doc. 28) be granted in part and denied in part**. I **recommend**

- The Court **grant** Defendant's motion regarding evidence seized from the search of the Brinks box;

- The Court **deny** Defendant's motion regarding Defendant's statements made on the porch;

- The Court **deny as moot** Defendant's motion regarding Defendant's statements allegedly made inside the house because they were not proved to have been made;

  - I further recommend the Court **preclude the Government** from offering other evidence that such statements were made.

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** this 25th day of October, 2019.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa