# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>vs.<br><br>MICHELLE RAE SIMMERMAKER,<br><br>  Defendant. | No. 19-CR-55-CJW-MAR<br><br>**ORDER** |

## I.  INTRODUCTION

This matter is before the Court on a Report and Recommendation ("R&R") (Doc. 43) of the Honorable Mark A. Roberts, United States Magistrate Judge.  On August 5, 2019, defendant filed a Motion to Suppress.  (Doc. 28).  On August 12, 2019, the government timely filed a resistance.  (Doc. 31).  On September 12, 2019, Judge Roberts held a hearing on the motion.  (Doc. 35).  On September 26, 2019, both parties timely filed supplemental briefs pursuant to Judge Roberts' order.  (Docs. 41 & 42).

On October 25, 2019, Judge Roberts issued his R&R, recommending that the Court grant in part and deny in part defendant's Motion to Suppress.  (Docs. 28 & 43).  Specifically, Judge Roberts found that although defendant was in custody, her statements made on the porch of the residence were voluntary and not the result of police interrogation.  (Doc. 43, at 12-18).  Defendant's statements were therefore not obtained in violation of her *Miranda* rights and are admissible at trial.  (*Id.*, at 18).  Judge Roberts found, however, that the search of defendant's Brinks box was unreasonable and any evidence resulting from the search should be suppressed.  (*Id.*, at 27).  The deadline for filing objections to the R&R was November 8, 2019.  (*Id.*, at 28).  On November 8, 2019, both parties filed objections to the R&R (Docs. 46, 47, & 48).

1

For the following reasons, the Court **adopts in part** and **rejects in part** Judge Roberts' R&R (Doc. 43) and **denies** defendant's Motion to Suppress (Doc. 28).

## II. STANDARD OF REVIEW

The court reviews the magistrate judge's report and recommendation pursuant to the statutory standards found in 28 U.S.C. § 636(b)(1):

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1) (2006); *see* FED. R. CIV. P. 72(b) (stating identical requirements). While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue de novo if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a de novo or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985). Thus, a district court may review de novo any issue in a magistrate judge's report and recommendation at any time. *Id.* If a party files an objection to the magistrate judge's report and recommendation, however, the district court must "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). In the absence of an objection, the district court is not required "to give any more consideration to the magistrate's report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

De novo review, of course, is nondeferential and generally allows a reviewing court to make an "independent review" of the entire matter. *Salve Regina Coll. v.*

*Russell*, 499 U.S. 225, 238 (1991) (noting also that "[w]hen de novo review is compelled, no form of appellate deference is acceptable"); *see Doe v. Chao*, 540 U.S. 614, 620–19 (2004) (noting de novo review is "distinct from any form of deferential review"). The de novo review of a magistrate judge's report and recommendation, however, only means a district court "'give[s] fresh consideration to those issues to which specific objection has been made.'" *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R.Rep. No. 94–1609, at 3, reprinted in 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments affect 28 U.S.C. § 636(b))). Thus, although de novo review generally entails review of an entire matter, in the context of § 636 a district court's required de novo review is limited to "de novo determination[s]" of only "those portions" or "specified proposed findings" to which objections have been made. 28 U.S.C. § 636(b)(1); *see Thomas*, 474 U.S. at 154 ("Any party that desires plenary consideration by the Article III judge of any issue need only ask." (emphasis added)). Consequently, the Eighth Circuit Court of Appeals has indicated de novo review would only be required if objections were "specific enough to trigger de novo review." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). Despite this "specificity" requirement to trigger de novo review, the Eighth Circuit Court of Appeals has "emphasized the necessity . . . of retention by the district court of substantial control over the ultimate disposition of matters referred to a magistrate." *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994). As a result, the Eighth Circuit has concluded that general objections require "full de novo review" if the record is concise. *Id.* ("Therefore, even had petitioner's objections lacked specificity, a de novo review would still have been appropriate given such a concise record."). Even if the reviewing court must construe objections liberally to require de novo review, it is clear to this Court that there is a distinction between making an objection and making no objection at all. *See Coop. Fin. Ass'n, Inc. v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996) ("The court finds that the distinction between a

3

flawed effort to bring objections to the district court's attention and no effort to make such objections is appropriate.").

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting when no objections are filed and the time for filing objections has expired, "[the district court judge] would only have to review the findings of the magistrate judge for clear error"); *Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the advisory committee's note to FED. R. CIV. P. 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"); *Branch*, 886 F.2d at 1046 (contrasting de novo review with "clearly erroneous standard" of review, and recognizing de novo review was required because objections were filed).

The court is unaware of any case that has described the clearly erroneous standard of review in the context of a district court's review of a magistrate judge's report and recommendation to which no objection has been filed. In other contexts, however, the Supreme Court has stated the "foremost" principle under this standard of review "is that '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Thus, the clearly erroneous standard of review is deferential, *see Dixon v. Crete Med. Clinic, P.C.*, 498 F.3d 837, 847 (8th Cir. 2007) (noting a finding is not clearly erroneous even if another view is supported by the evidence), but a district court may still reject the magistrate judge's report and recommendation when the district court is "left with a

definite and firm conviction that a mistake has been committed," *U.S. Gypsum Co.*, 333 U.S. at 395.

Even though some "lesser review" than de novo is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads this Court to believe that a clearly erroneous standard of review should generally be used as the baseline standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections, *see Grinder*, 73 F.3d at 795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; *see also* FED. R. CIV. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."). In the context of the review of a magistrate judge's report and recommendation, the Court believes one further caveat is necessary: a district court always remains free to render its own decision under de novo review, regardless of whether it feels a mistake has been committed. *See Thomas*, 474 U.S. at 153–54. Thus, although a clearly erroneous standard of review is deferential and the minimum standard appropriate in this context, it is not mandatory, and the district court may choose to apply a less deferential standard.

### III.   FACTUAL BACKGROUND

After reviewing the record, the Court finds that Judge Roberts accurately and thoroughly set forth the relevant facts in his R&R. (Doc. 43, at 2-7). Further, neither of the parties have objected to Judge Roberts' summary of the facts here. Therefore, the Court adopts Judge Roberts' factual findings as set forth below without modification. (*See id.*) (footnotes omitted).

> On November 15, 2018 members of the Cedar County Drug Task Force executed a search warrant at a single-family residence on Meridian Street in Tipton, Iowa. The residence was the home of WS. The warrant had been signed two days previously by an Iowa state court judge. (Gov.

5

Ex. 1.) Tipton Police Sergeant Bradley Peck executed the affidavit in support of the warrant. (*Id*.) Much of the factual basis for the warrant was obtained from informant CS. CS told Sergeant Peck and Cedar County Deputy Sheriff Matt Jackson that JT was a low-level methamphetamine distributor in Tipton who was supplied by MW. CS told the investigators that JT was living with WS, a woman. WS had a criminal history including possession of controlled substances. Moreover, CS told officers he had been living with WS while also selling narcotics in Tipton. Sergeant Peck's affidavit states, "The residence that [JT] was living in with [WS] has a history of drug use, and people coming and going from the residence are known drug users." (*Id*. at 5.)

The warrant authorized search of the residence as well as the person of WS. The warrant authorized the search and seizure of a variety of items relating to drug trafficking including controlled substances, paraphernalia packaging, items used for consumption of controlled substances, items used to manufacture or deliver controlled substances, photographs or data having information associated with drug trafficking, weapons, currency, and other items. Significantly, the warrant authorized search and seizure of "[l]ocked containers, safes, hidden compartments or other items or areas capable of storing or concealing any of the other items listed herein." (*Id*. at 10.)

A second application for a search warrant was sought and obtained after execution of the first warrant. The second application is identical to the first application except that it also seeks permission to search Defendant and provides the additional information:

> 12. During the execution of a search warrant at the residence, MICHELLE SIMMERMAKER was located in the living room area sleeping on the couch. MICHELLE SIMMERMAKER advised she has been staying at the residence for approximately 1 week.
> 13. MICHELLE SIMMERMAKER has prior convictions for possession of methamphetamine in 2017.
> 14. Found on the couch with MICHELLE SIMMERMAKER was a glass pipe used for smoking methamphetamine.
> 15. Found on the couch with MICHELLE SIMMERMAKER was a box containing plastic baggies with a crystal substance that appears consistent with methamphetamine.

(Gov. Ex. 2 at 6.) The search of the Brinks box occurred before law enforcement obtained the second warrant. There is no allegation that

6

Defendant consented to the search or that exigent circumstances somehow excused the warrant requirement. Thus, the crucial issue with respect to the search of the Brinks box is whether the first warrant authorized its search.

The events at the residence are relevant to the claim of an unlawful search and the alleged *Miranda* violation. A description of the events during the search is made more complicated by the number of law enforcement officers and the persons present at the residence during the search. Parts of the search were captured and preserved on video from the body cameras of some of the officers. The Government represents, after conferring with Defendant's counsel that the body cameras record the following start times:

1) Government's Exhibit 3 (Koranda) at 10:01 a.m. on November 15, 2018;
2) Government's Exhibit 4 (Koranda) at 9:41 a.m. on November 15, 2018;
3) Government's Exhibit 5 (Koranda) at 10:13 a.m. on November 15, 2018;
4) Government's Exhibit 7 (Sorgenfrey) at 9:29 a.m. on November 15, 2018.

(Doc. 41 at 3.) Deputy Koranda was wearing a body camera that captured, among other things, the outside of the residence during the search while he was providing security. During the approximately 10 to 15 minutes he stood outside, the children who were present when law enforcement arrived to execute the search exited the residence and left with a man in a pickup truck. (Koranda Hr'g Test.) Also during this time, Deputy Koranda arranged to have a woman employed by the Sheriff's office come to the residence to pat down Defendant to allow Defendant to use the restroom while the search was being completed.

Deputy Koranda briefly went inside and then came back out. He turned his body camera on again and recorded a conversation involving Defendant, Deputy Jackson, and Sergeant Peck. Deputy Koranda also transported Defendant to jail. At no time did Deputy Koranda administer a *Miranda* warning. Deputy Koranda testified that he did not attempt to interview Defendant because he was not part of the search team.

Sergeant Peck had been conducting an investigation of WS in November 2018, which resulted in the warrant to search her person and residence as shown in Exhibit 1. At the residence at the time of the search were TH, WS, DW, and Defendant, as well as two young children.

7

Defendant was sleeping on a couch in the living room on the main floor. Defendant was alone in the room when she was located. (Jackson Hr'g Test.) Investigators later learned from WS that Defendant had been staying at the residence for two nights. Prior to entering the residence, law enforcement did not know Defendant would be present.

Sergeant Peck testified he believed [Detective Andy Fry ("Detective Fry")],[1] another member of the Muscatine County Drug Task Force, found the Brinks box on top of the couch where Defendant was sleeping. [Detective Fry] was not called to testify, no recording from his body camera (if any exists) was offered, and no witness testified about observing this search (if there was such a witness).

The Brinks box is made of steel, is secured with a key lock and is a rectangular shape approximately eight inches by four inches by four inches. [Detective Fry] also found the pipe used to smoke methamphetamine near where Defendant was sleeping, as detailed in Government's Exhibit 2. After Defendant was awakened, she was summoned from the couch in the living room and placed in the dining room area with other adult occupants of the residence by Deputy Jackson. Defendant was handcuffed, placed in a chair, and told she should not get up. (Peck Hr'g Test.) Sergeant Peck testified it was necessary for the occupants of the residence to remain in place for officer safety. (*Id.*) Defendant was never told she was free to leave.

One of the members of the search team took photographs depicting the condition of the rooms prior to commencing the search. (Jackson Hr'g Test.) It is unclear who took the pictures. Government Exhibit 6, page 2 depicts the living room in its condition after Defendant was summoned to the dining room by Deputy Jackson. This photograph shows the Brinks box on the couch where Defendant was initially found. (*Id.*)

When opened, the Brinks box proved to hold four baggies containing approximately 14 grams of methamphetamine, some smaller baggies, a scale, and some other drug paraphernalia. (Peck Hr'g Test.) Defendant's phone was also found in or near the box. (*Id.*)

I find that, contrary to Defendant's allegation, the officers did not force open the Brinks box but used a key. It is unclear how [Detective Fry] located and identified the key to the Brinks box. It took law enforcement less than half an hour to amend the prior warrant application to include the additional information and return with a signed warrant.

---

[1] The R&R mistakenly refers to Detective Andy Fry as Officer Andy Frey. (Doc. 43, at 5-27).

During this approximately half-hour interval, Defendant remained in the residence.

None of the witnesses testified that Defendant was asked whether the box belonged to her. Nor did they identify any statements from her claiming ownership. Sergeant Peck, who was in charge of the investigation, did not know what Defendant may have said about the box at the time it was found. (*Id.*) Defendant did not testify at the hearing. However, the nature of the arguments submitted on her behalf suggests she may remember the events and discussion with the officers differently. These arguments are not evidence. The body camera videos disclose some comments she made, but none are particularly relevant or incriminating. The warrant application mentions her statement that she had been staying at the residence for a week. (Gov. Ex. 2 at 6.)

Sergeant Peck testified that although Defendant was placed in handcuffs when law enforcement first entered the residence, she was not placed under arrest. Her handcuffs were later removed after she was patted down so she could use the restroom unattended. In addition, Defendant was permitted to go outside to smoke a cigarette without handcuffs but under the supervision of law enforcement officers. Sergeant Peck testified that while Defendant was outside smoking, he walked out and simply asked if she wanted to talk to the officers. He testified that Defendant declined to be interviewed. He testified that she was not Mirandized, she stayed on the porch smoking, and the conversation did not continue.[2] At this point, Defendant was not wearing handcuffs, but she was not free to leave. (Peck Hr'g Test.)

It is at this juncture that Defendant made statements that may be relevant to the case. Sergeant Peck testified that Defendant criticized law enforcement in relation to its investigation and prosecution of her husband. More relevantly, she also stated several times that all the "meth" in the house belonged to her. Sergeant Peck testified these comments were not made in response to any inquiry from law enforcement. Sergeant Peck, who was in charge of the investigation, is not aware of any statements made by Defendant while she was handcuffed and detained in the dining room. In fact, he had made inquiry of the officers involved in the search, including [Detective Fry], and he was not aware of any other statements Defendant

---

[2] In his R&R, Judge Roberts noted that defendant and the officers "were not completely silent during this time." (Doc. 43, at 6 n.3). Specifically, defendant is asked at one point "if she had a phone and asked if it had a passcode." (*Id.*).

9

made about the contents of the Brinks box, its ownership, or other incriminating statements.

Deputy Jackson entered as part of the search team and made first contact with Defendant at the threshold of the living room. His approach to the living room can be seen briefly in the body camera video recorded by Officer Sorgenfrey. (Gov. Ex. 7 at 1:34.) Officer Sorgenfrey's body camera does not appear to show [Detective Fry] entering the residence. Deputy Jackson recognized Defendant and called her out of the living room, handcuffed her with her hands in front of her body, and had her sit on a chair in the dining room. After approximately 30 minutes, Defendant was patted down and permitted to use the restroom without being handcuffed. At this point Deputy Jackson did not consider her under arrest; however, she was not free to leave. (Jackson Hr'g Test.) Deputy Jackson also made inquiry of all the members of the search team who were present and none could recall asking Defendant if the Brinks box belonged to her.

Deputy Jackson was present on the porch while Defendant was smoking. He confirmed that Defendant declined to be interviewed and was not provided *Miranda* warnings. He testified Defendant continued to talk, but not in response to questions from officers. Detective Jackson recalls Defendant was upset with the prior investigation involving her husband. Defendant also seemed to want to clarify that other occupants of the house should not "get in trouble" and made statements to the effect that all the methamphetamine belonged to her.

(Doc. 43, 2-7).

## IV. ANALYSIS

The Court notes that two of Judge Roberts' legal conclusions in the R&R were not objected to by the parties. First, Judge Roberts concluded that the government had effectively stipulated that defendant "made no statements while she was detained in the dining room." (*Id.*, at 12). The government has clarified that no such statements exist. (Doc. 41, at 6 n.2). Finding no clear error in this portion of the R&R, the Court adopts Judge Roberts' conclusion on this issue. Thus, the government may not later "offer contradictory evidence at trial" that defendant made incriminating statements inside the residence. (Doc. 43, at 12). Second, Judge Roberts also concluded that defendant was

in custody when she was on the porch outside the residence. (*Id.*, at 16). Finding no clear error in this portion of the R&R, the Court adopts Judge Roberts' conclusion on this issue. (*Id.*).

The parties have, however, objected to Judge Roberts' other legal conclusions. Defendant objects to Judge Roberts' conclusion that she was not being interrogated while on the porch outside the residence. (Doc. 48). The government objects to Judge Roberts' conclusion that the search of the Brinks box was unreasonable. (Docs. 46 & 47). The Court addresses both objections below.

### A.     *Defendant's Statements on the Porch*

Defendant objects to the R&R, asserting that her statements to law enforcement officers on the porch of the residence were made pursuant to a custodial interrogation in violation of her *Miranda* rights.[3] (Doc. 48, at 2). Defendant argues that law enforcement officers intentionally placed her on the porch so that defendant would observe contraband being removed from the residence and claim ownership of it. (*Id.*). Defendant asserts that law enforcement officers were aware that defendant knew that methamphetamine was recovered from her Brinks box, that defendant knew her husband had recently been convicted of a methamphetamine charge, and that defendant "knew the severe consequences" of being prosecuted in federal court. (*Id.*, at 3). Given that law enforcement officers knew that defendant was aware of these facts, defendant asserts that the officers knew that it was reasonably likely that defendant would make an incriminating statement under these circumstances. (*Id.*).

---

[3] In her objections, defendant also contests whether she made any statements on the porch at all. (Doc. 48, at 1-2). Defendant notes that her alleged statements were not captured by video or audio recording. (*Id.*, at 2). Given the consistent testimony of officers (Doc. 44, at 25, 51), the Court finds the government has produced sufficient evidence at this stage that such statements did occur. In any event, defendant may still contest this matter at trial.

*Miranda* warnings are only necessary when a defendant is subjected to a custodial interrogation. *United States v. Layne*, 973 F.2d 1417, 1421 (8th Cir. 1992). "Interrogation occurs only when there is express police questioning or its 'functional equivalent,' which means 'words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Bailey*, 831 F.3d 1035, 1038 (8th Cir. 2016) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980)). Although law enforcement officers "cannot be held accountable for the unforeseeable results of their words or actions," the definition of interrogation focuses on the suspect's perception, regardless of whether law enforcement officers intended to elicit an incriminating statement. *Innis*, 446 U.S. at 301-02. "Voluntary statements unprompted by interrogation are admissible with or without *Miranda* warnings." *Bailey*, 831 F.3d at 1038.

In his R&R, Judge Roberts found that "there is no evidence that law enforcement, in merely removing evidence from the scene in Defendant's presence, had undertaken the functional equivalent of interrogation." (Doc. 43, at 18). Judge Roberts found this case to be similar to *Young v. Sirmons*, wherein officers looked at and discussed a bloody pair of shoes in defendant's presence and defendant interjected that the blood may be from when he was cleaning fish. (*Id.*) (citing *Young v. Sirmons*, No. 00-CV-00310-JHP-PJC, 2007 WL 2248158, at *27 (N.D. Okla. Aug. 2, 2007), *aff'd*, 551 F.3d 942 (10th Cir. 2008)). The Court in *Young* found defendant's statement to be voluntary, noting that the "record does not suggest that the actions of the officers constituted the kind of psychological ploy that could be treated as the functional equivalent of interrogation." 2007 WL 2248158, at *29. Judge Roberts similarly concluded that defendant's statements here were "not the product of interrogation" under these circumstances. (Doc. 43, at 18).

Here, the Court also finds no evidence that police intended to elicit an incriminating statement from defendant and that police had no reason to believe any such statement was reasonably likely to occur by their mere removal of evidence from the residence. Defendant was present on the porch in order to smoke a cigarette, presumably at her own request. (Doc. 44, at 23-24, 49). Defendant was asked if she would like to give a voluntary statement and she declined. (*Id.*, at 25). Aside from questions normally attendant to custody, all questioning ceased upon defendant's refusal. (*Id.*). As defendant admits, the only potential interrogative act was police removing contraband from the residence in her presence.

Even assuming law enforcement officers were aware of all the facts defendant cites, these facts do not create a reasonable likelihood that defendant would claim ownership of the contraband or otherwise make an incriminating statement. Given that the contraband was recovered from defendant's Brinks box, eliciting defendant's admission of ownership, although helpful, would be superfluous to evidence already obtained. Further, if defendant knew what was in the Brinks box and knew the box was being searched, it is unclear why walking the contents of the box past her would elicit any further statements on her part. Moreover, law enforcement officers' awareness of defendant's husband's conviction could just as easily had led them to believe that defendant would be that much more reluctant to make an incriminating statement. If defendant was aware of the "severe consequences" of such a conviction, it is just as likely that she would deny ownership or refuse to make any statement at all. In other words, the Court fails to see how the circumstances made an admission or other incriminating statement more likely than any other response or no response at all. The facts here not only fail to reflect a "psychological ploy" by law enforcement officers, but also fail to show that defendant's response was foreseeable. *See Innis*, 446 U.S. at 301-02; *Young*, 2007 WL 2248158, at *29.

Ultimately, the Court finds no basis to conclude that law enforcement officers' removal of evidence from the residence was the functional equivalent of an interrogation. The Court finds that defendant's mere witnessing of contraband being removed from the residence did not create a reasonable likelihood that she would make an incriminating statement. For these reasons, the Court **overrules** defendant's objection (Doc. 48) and **adopts** Judge Roberts' R&R (Doc. 43) on this issue.

### B. *Search of the Brinks Box*

The government objects to the R&R, asserting that officers properly searched defendant's Brinks box. (Docs. 46 & 47). The government asserts that the warrant authorized search of the Brinks box and the search was proper due to defendant's status as an overnight guest and the evidence linking defendant to criminal activity. (Doc. 47, at 4). The government also argues that Judge Roberts failed to apply the collective knowledge doctrine here. (*Id.*).

"[A]ny container situated within residential premises which is the subject of a validly-issued warrant may be searched if it is reasonable to believe that the container could conceal items of the kind portrayed in the warrant." *United States v. Gray*, 814 F.2d 49, 51 (1st Cir. 1987). Although a warrant "generally justifies searching the effects of those occupying the premises, special Fourth Amendment concerns arise when the persons on the premises are visitors." *Hummel-Jones*, 25 F.3d 647, 651 (8th Cir. 1994) (citations omitted). Mere presence at a location subject to a warrant is insufficient to overcome a visitor's privacy interests. *See, e.g.*, *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). Instead, courts must "focus on the relationship between the visitor and the place" to determine "whether that relationship is such that it is reasonable for [law enforcement officers] to believe that the warrant overcomes the visitor's independent Fourth Amendment privacy rights." *Hummel-Jones*, 25 F.3d at 651. Such rights are more easily overcome when evidence connects the visitor to the illegal activity on which

the search is based. *See id.* (citing *Ybarra*, 444 U.S. at 91-94); *see also United States v. Clay*, 640 F.2d 157, 162 (8th Cir. 1981) (noting that the search of a visitor may be justified if "suspicion exists sufficient to draw a reasoned conclusion that the visitor is involved in the criminal activity" being investigated). Generally, "the burden of proof is on the defendant who seeks to suppress evidence[.]" *United States v. Carter*, 729 F.2d 935, 940 (8th Cir. 1984).

Under the Fourth Amendment, probable cause is an objective analysis based on the totality of the circumstances known to the officer at the time of the search. *Whren v. United States*, 517 U.S. 806, 813 (1996). The facts known by the officer must be "sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *United States v. Henderson*, 241 F.3d 638, 648 (9th Cir. 2000). The collective knowledge doctrine "imputes the knowledge of all officers involved in an investigation upon the seizing officer in order to uphold 'an otherwise invalid search or seizure.'" *United States v. Banks*, 514 F.3d 769, 776 (8th Cir. 2008) (citing *United States v. Gillette*, 245 F.3d 1032, 1034 (8th Cir. 2001)). This doctrine "requires some degree of communication between the officer who possesses the incriminating knowledge and the officer who does not." *Id.* This requirement is intended to distinguish between "officers functioning as a search team and officers acting as independent actors who merely happen to be investigating the same subject." *Id.* (citing *Gillette*, 245 F.3d at 1034). When officers function as a search team, probable cause to search is properly assessed on the basis of their combined knowledge because "we presume that the officers have shared relevant knowledge which informs the decision to seize evidence or to detain a particular person." *United States v. O'Connell*, 841 F.2d 1408, 1419 (8th Cir. 1988).

Judge Roberts erred in finding that the search of the Brinks box was improper. (Doc. 43, at 18-27). Specifically, Judge Roberts did not apply the collective knowledge

15

doctrine and placed too much emphasis on Detective Fry's individual knowledge. (*Id.*, at 26-27). The officers investigating the residence were working as a singular search team, not as separate entities. *See Banks*, 514 F.3d at 776. Thus, probable cause is appropriately assessed on the officers' collective knowledge, not on Detective Fry's knowledge alone. *See id.* Moreover, the inferences officers "actually made" are immaterial under the Fourth Amendment's objective analysis. (Doc. 43, at 27); *Whren*, 517 U.S. at 813. Therefore, the Court must reassess whether probable cause existed to search the Brinks box based on all the facts and circumstances known to all the officers.

Sufficient facts were present to establish probable cause that defendant was an overnight guest at the residence. Defendant was sleeping in the living room of the residence when officers arrived and was dressed in clothes consistent with an overnight stay, similar to the defendants in *United States v. Giwa*, 831 F.2d 538, 543-44 (5th Cir. 1987)[4] and *United States v. Hunter*, No. 99-3213, 2000 WL 622858, at *1 (8th Cir. May 16, 2000).[5] (Gov. Ex. 3). Defendant was the only adult on the downstairs level of the residence. (Doc. 44, at 18-19). Defendant had some of her possessions positioned around her, including a methamphetamine pipe and the Brinks box. (*Id.*, at 20-21). Defendant's daughter frequented the residence and her granddaughter was also present there at the time of the search. (*Id.*, at 19, 35). The totality of these facts would warrant a prudent person in believing that defendant was an overnight guest, not a mere visitor.

---

[4] "Giwa had been sleeping and answered the door clad only in a bathrobe and slacks, apparel indicating that his was more than just a temporary presence in the apartment. Finally, Giwa was discovered alone in a private residence." *Giwa*, 831 F.2d at 544-45.

[5] The court found that defendant was more than a mere visitor "given the presence of his belongings in the bedroom, the lack of clothing on him when he attempted to exit from the second-story window . . ., and an airline tag on his duffel bag indicating he had arrived in town more than two weeks before the search." *Hunter*, 2000 WL 622858, at *1.

*See Hummel-Jones*, 25 F.3d at 651. Therefore, given defendant's relationship to the residence, defendant's Brinks box was properly within the scope of the warrant.

Sufficient facts were also present that defendant was connected to the criminal activity being investigated. Officers knew the residence to be associated with drug use. (Doc. 32-1). Officers were aware that defendant was convicted the previous year of possessing methamphetamine and that defendant's husband was charged with federal drug trafficking offenses. (*Id.*). Officers also observed defendant sleeping on the couch alone with a methamphetamine pipe. (Doc. 44, at 20-21). Although the residence here is a larger space than a vehicle, hotel room, or apartment, these facts gave law enforcement officers additional reason to suspect defendant was involved in drug-related activity beyond her mere presence in the living room. *See, e.g.*, *United States v. Cowan*, 674 F.3d 947, 954 (8th Cir. 2012). The totality of these facts would warrant a prudent person in believing that defendant was connected to the drug activity being investigated. *See Clay*, 640 F.2d at 162. Therefore, as a result of this connection, officers had probable cause to search defendant's Brinks box.

Thus, the Court finds the search of defendant's Brinks box did not violate her Fourth Amendment rights and suppression of evidence obtained from the box is not required. For these reasons, the Court **sustains** the government's objection (Docs. 46 & 47) and **rejects** Judge Roberts' R&R (Doc. 43) on this issue.

## *V.     CONCLUSION*

For the reasons set forth above, the Court **adopts in part** and **rejects in part** Judge Roberts' R&R (Doc. 43) and **denies** defendant's Motion to Suppress (Doc. 28).

**IT IS SO ORDERED** this 15th day of November, 2019.

_____
C.J. Williams
United States District Judge
Northern District of Iowa